# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ERIC JEROME JACKSON, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Case No. CIV-16-580-RAW-KEW |
| | ) |
| TOMMY SHARP, Interim Warden, | ) |
| | ) |
| Respondent. | ) |

## OPINION AND ORDER

This matter is before the court on Petitioner's petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. [Doc. 1]. Petitioner, a *pro se* prisoner in the custody of the Oklahoma Department of Corrections, is currently incarcerated at the Oklahoma State Penitentiary in McAlester, Oklahoma. Following a jury trial, Petitioner was convicted of one count of Unlawful Possession of a Controlled Dangerous Substance (Methamphetamine) (63 O.S.Supp.2012, § 2-402), after former conviction of two or more felonies, in Carter County District Court Case No. CF-2013-344. He was sentenced to fifteen years of imprisonment in accordance with the jury's recommendation.

Petitioner was represented by counsel Eric R. Jones at trial and counsel Robert W. Jackson with the Oklahoma Indigent Defense System on direct appeal. Appellate counsel raised one claim on direct appeal, arguing that Petitioner's Sixth Amendment rights were violated when the trial court refused to allow him to call a material witness in his defense. [Doc. 13-2]. Petitioner's conviction was affirmed by the Oklahoma Court of Criminal Appeals (OCCA) on direct appeal. *See Jackson v. State*, F-2014-222 (Okla. Crim. App. Jan. 6, 2015) (unpublished). [Doc. 13-4].

In this habeas action, Petitioner alleges that his appellate counsel was ineffective for failing to argue on direct appeal that trial counsel was ineffective for not objecting when the prosecutor deliberately deceived the jury by presenting false testimony. Respondent concedes the § 2254 petition is timely and that Petitioner has exhausted his state court remedies for the purpose of

federal habeas corpus review. [Doc. 13 at 3].[1] Petitioner, appearing *pro se*, previously filed two applications for post-conviction relief in the state district court. [Docs. 13-5 and 13-6]. Both applications were almost identical, and Petitioner asserted the same claim of ineffective assistance of appellate counsel for failing to raise the claim of ineffective assistance of trial counsel on direct appeal. The Carter County District Court denied relief [Doc. 13-8], and Petitioner appealed the state trial court's order denying post-conviction relief. He filed a petition in error and brief in support of petition in error with the OCCA. [Docs. 13-9 and 13-10]. The OCCA affirmed the district court's denial of post-conviction relief. [Doc. 13-11].

The following have been submitted for consideration in this matter:

    A.    Petitioner's direct appeal brief.
    B.    State's brief in Petitioner's direct appeal.
    C.    Summary Opinion affirming Petitioner's judgment and sentence.
    D.    Petitioner's applications for post-conviction relief.
    E.    State's response to Petitioner's application for post-conviction relief.
    F.    Order denying Petitioner's application for post-conviction relief.
    G.    Petition in error.
    H.    Brief in support of petition in error.
    I.    Order affirming denial of post-conviction relief.
    J.    State court record.
    K.    Transcripts.[2]
    L.    Trial exhibits.

**Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act, federal habeas corpus relief is proper only when the state court adjudication of a claim:

---

[1] This court's record citations refer to the CM/ECF page numbers in the upper right-hand corner of each document.

[2] The transcript of jury trial [Doc. 14-2] and transcript of sentencing [Doc. 14-4] were filed by Respondent. For unknown reasons, a transcript of preliminary hearing from a different state case, Carter County Case No. CF-2013-661, was also filed herein. [Doc. 14-1].

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

**Factual Background**

On June 26, 2013, at approximately 1:40 a.m., Ardmore Police Officer Juan Galicia pulled behind a truck and noticed the operational failure of the center brake light. [Doc. 14-2 at 123, 134]. Before the officer could make the stop, however, the vehicle turned into a driveway and its driver turned off the vehicle headlamps. *Id*. at 123. Thinking such activity was strange, Officer Galicia traveled a short distance down the road and set up near an intersection. *Id*. After a brief period of time, the vehicle approached the intersection. *Id*. at 123-24. Officer Galicia pulled behind the truck and activated his overhead lights to initiate a traffic stop. *Id*. at 124.

The vehicle came to a stop and Officer Galicia made contact with the driver and three occupants. *Id*. Officer Galicia asked Petitioner, who was the driver, to provide a driver's license and insurance verification. *Id*. at 124-25. Petitioner provided an insurance verification for a different vehicle, but not for the truck that had been stopped. *Id*. at 125. He did not provide a driver's license. *Id*. After gathering information about Petitioner and his passengers, the officer contacted dispatch for a license and warrant check. *Id*. Petitioner did not hold a valid driver's license, and he was placed under arrest and handcuffed. *Id*. at 126, 128, 135. Officer Galicia testified at trial that he "conducted two series of searches" on Petitioner:

> The first was a pat search, which is you pat the outer clothing -- clothing around the pockets, anything where you need to go inside to ensure that there's nothing in there that could be dangerous to you or to him, whether it be weapons, needles, sharp objects. Once I conducted that and felt that it was safe for me to go inside his pockets, I conducted a search of his pockets, reaching inside of all of his pockets

> and making sure he had nothing – no illegal contraband, anything illegal, any weapons, such as a pocketknife or anything that could be used as a weapon[.]

*Id*. at 126-27. Officer Galicia explained that these searches were "not necessarily" designed to find something like a small baggie, although he was checking for both weapons and drugs. *Id*. at 127, 135. The officer also confirmed that part of the search involved the patting down of both legs. *Id*. at 136. Officer Galicia then transported Petitioner to the Carter County Jail. *Id*. at 128. Petitioner's girlfriend at the time, Cheyenne Burkett, who had been seated in the front passenger seat of Petitioner's truck, was arrested because of a local warrant, and taken to the jail by another officer responding to the scene. *Id*. at 128, 165.

Officer Galicia arrived at the Carter County Detention Center and pulled into the "sally port," an enclosed garage-like structure attached to the jail building. *Id*. at 128. Petitioner was escorted to the book-in area by Deputy Danny Renken, and Officer Galicia searched the back seat area where Petitioner had been for anything that may have been left behind. *Id*. at 128, 137, 145. Deputy Renken told the jury that, at one point, Petitioner's pants were "sagging down" and the deputy pulled them up. *Id*. at 145. Petitioner's handcuffs were removed, and Deputy Renken asked Petitioner whether there was anything in his clothing that might stick or poke the deputy during the pat down. *Id*. at 146-47. He then described his search of Petitioner:

> As I was proceeding to pat him down and all that stuff, when I got to his – his legs and stuff like that, I told him to raise his left leg up so I could check his sock out, and a little package fell out onto the floor down by his foot.

*Id*. at 147. The deputy also provided the following responses during cross-examination:

> Question: Okay. Now, you pulled his pants up and nothing fell out then; is that correct?
>
> Answer: Correct.
>
> Question: Do you know exactly from where - - from where this baggy fell?
>
> Answer: As soon as he lifted his foot up when I was going to pat down his sock and check his feet out, it fell out right on the floor out of his pant leg.
>
> Question: Was it near his - - came out near his sock or around his sock or around his ankle?
>
> Answer: I don't know. It just fell out of his pant legs and onto the ground.

*Id*. at 151.

The package, more specifically described as a small plastic baggie wrapped tightly within another small plastic baggie, was picked-up by the deputy at approximately the same time that Officer Galicia was making his way from the sally port to the book-in area. [Doc. 14-2 at 128-29, 147-48, 155; Doc. 14-3 at 3]. Deputy Renken gave the baggie to Officer Galicia for processing, and the officer was informed that it "had fallen out of the Defendant's pant leg." [Doc. 14-2 at 128-29, 138, 147-48, 156-57, 197]. The deputy acknowledged at trial that this was not the first time that he had found contraband when doing a search on an inmate, and further agreed that it happens with some regularity. *Id*. at 155-56.

The State next called Mistie Burris as a witness. *Id*. at 158. Ms. Burris, a criminalist supervisor at the Oklahoma State Bureau of Investigation, testified that she had performed three different analyses on the substance within the baggies. *Id*. at 162. The package contained 1.92 grams of methamphetamine. *Id*.

In his case-in-chief, Petitioner told a story contrary to that of Officer Galicia and Deputy Renken. Petitioner admitted his prior usage of methamphetamine, but denied it had been on his person in the jail that night. *Id*. at 173-76, 182, 189-90. Petitioner focused on the multiple searching opportunities the police had to discover the drugs, stating that he had been searched as many as four separate times and that the drugs did not drop from his pant leg during the search. *Id*. at 170-76, 182-83, 189-92. He claimed that Officer Galicia had found the drugs on the floor behind him, that Deputy Renken was lying, and that the footage from the surveillance cameras in the book-in area would "prove" his innocence, but that the footage was unavailable. *Id*. at 172-73, 175, 179, 183-84. According to the Petitioner, Officer Galicia had previously expressed his intent at the scene "to get [Petitioner] off the streets." *Id*. at 169, 183. Petitioner also testified that other arrestees, including his former girlfriend, were seated on the bench in the book-in area when the drugs were found. *Id*. at 173-75. When asked if he thought he was being framed by Deputy Renken and Officer Galicia, Petitioner stated "I can't say they're framing me, but they found meth on the floor. They didn't get it off of me." *Id*. at 189.

Petitioner admitted that he had been previously convicted of three felonies: Possession of a Stolen Vehicle; Possession of a Controlled Dangerous Substance; and Unlawful Distribution of

a Controlled Dangerous Substance Within 2000 Feet of a School, After Former Conviction of a Felony. [Doc. 14-2 at 176-77, 179-81, 192; Doc. 14-3 at 7-12]. Petitioner also conceded that he used illegal drugs and had been doing so since he "was 10 or 11" years old. [Doc. 14-2 at 181-82].

Deputy Michael Armstrong, the jail administrator, rebutted Petitioner's suggestions of sinister motives regarding the destruction of the surveillance footage. Deputy Armstrong testified that Petitioner had never reported to him that others in the jail had conspired to plant methamphetamine on Petitioner. *Id*. at 194. Had anyone made a request for him to do so, Deputy Armstrong stated, he would have "[p]ulled the video and burn[ed] the disk off." *Id*. Deputy Armstrong also testified that the jail surveillance videos are recorded over "about every three weeks." *Id*. The jail administrator further explained that, even if the recordings had been preserved, there was no guarantee that Petitioner's incident would have been caught on camera. *Id*. at 195.

Lastly, Officer Galicia was recalled by the State in rebuttal. The officer did not recall saying "We've got to get you off the streets" before Petitioner was arrested. *Id*. at 196.


**Appellate counsel was ineffective for failing to argue on direct appeal that trial counsel was ineffective for not objecting when the prosecutor deliberately deceived the jury by presenting false testimony.**

Petitioner essentially claims that he was framed by the prosecutor and State's witnesses. He contends that the drugs were actually found by Officer Galicia on the floor of the jail's book-in area, that Officer Galicia had previously stated that he wanted to get Petitioner off the streets, and that Deputy Renken was lying when he said the drugs fell out of Petitioner's pant leg. Petitioner told the jury that he had talked with Deputy Renken about his case "three or four times" and that the deputy's story "changed every time." *Id*. at 184. At some point during the conversations, Petitioner allegedly asked Deputy Renken "why he lied on [Petitioner], and . . . he said it was on camera that it fell out of [Petitioner's] sock." *Id*. Petitioner then claims that he asked his lawyer "Can you have them present those cameras? [Bec]ause I know those cameras will

6

prove my innocence." *Id*. It was at this point, according to the Petitioner, that his lawyer "comes back telling [him] that the DA said it's been recorded over, conveniently." *Id*.

Petitioner now directs the court's attention to page 149 of the trial transcript. In support of his sole ground requesting habeas relief, Petitioner is confident that Deputy Renken discussed the events surrounding Petitioner's arrest with Deputy Armstrong, the jail administrator, and that Deputy Armstrong therefore knew that Petitioner was denying that the drugs belonged to him, and that Deputy Armstrong destroyed the surveillance tapes "in bad faith," knowing that the surveillance footage was "possibly exculpatory" and could prove his innocence. [Doc. 1 at 4]. Petitioner does not claim that he has seen the footage, and there is no way of knowing whether the cameras actually captured the moment when the drugs were found in the jail. Nonetheless, Petitioner claims the prosecutor knew Deputy Armstrong's testimony at trial was false, and that his trial attorney was ineffective for failing to object to the prosecution's use of the perjurious testimony, and that his appellate counsel was therefore ineffective for failing to raise the claim of ineffective assistance of trial counsel on direct appeal.

In response, Respondent directs the court's attention to *Hawkins v. Hannigan*, 185 F.3d 1146, 1152 (10th Cir. 1999) and *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003), arguing that the OCCA's determination that Petitioner was not denied effective assistance of appellate counsel is not contrary to, or an unreasonable application of, Supreme Court precedent as set forth in *Strickland v. Washington*, 466 U.S. 688 (1984). [Doc. 13 at 20]. Respondent more specifically sets forth the following argument:

> The OCCA concluded that Petitioner had established neither deficient performance nor resulting prejudice from his appellate counsel's failure to raise a claim on direct appeal against his trial counsel for failing to object to Deputy Armstrong's testimony (Exhibit 11, p. 4). With formidable grace, the OCCA framed Petitioner's claim as strongly and clearly as could be gleaned from his pleadings. The OCCA found the two underlying factual premises for Petitioner's claim– that the jail surveillance tapes contained exculpatory evidence and were purposely destroyed by Deputy Armstrong – unsupported by the record (Exhibit 11, p. 5). This determination by the state court is correct, as only Petitioner makes the giant inferential leap, without any evidence, that trial counsel's objection during Deputy Armstrong's testimony would have somehow resulted in proof that (a) a surveillance tape existed showing Petitioner in the sally port area with another person planting methamphetamine on him; or (b) Deputy Armstrong purposely

7

destroyed such a surveillance tape knowing that it showed Petitioner in the sally port area with another person planting methamphetamine on him.

Petitioner offered nothing but speculation and innuendo that the surveillance video portrayed him in the area, that the video would have revealed he was innocent of the crime, or that Deputy Armstrong had maliciously destroyed the video because it contained exculpatory evidence. Without any proof that Petitioner or his alleged innocence was memorialized on the surveillance tape, or that Deputy Armstrong purposely allowed the tape containing alleged exculpatory evidence to be taped over or otherwise destroyed, a viable claim of ineffective assistance of trial counsel for not lodging an objection at trial during Deputy Armstrong's testimony would have been fruitless on direct appeal. Neither deficient performance nor prejudice could be established because there was never any evidence, aside from Petitioner's self-serving declarations, that the methamphetamine that flowed out underneath his clothing did not belong to him. Nor was there any evidence that the discovery of Petitioner's methamphetamine would have even been captured clearly on the surveillance video had it been preserved. And although Petitioner points [to] testimony that Deputy Renken, when Deputy Armstrong came in to work the next morning, told Deputy Armstrong "what happened that night[,]" nothing about what appears to have been a routine shift-change encounter between officers imputes the insidious motivation that Petitioner brands upon Deputy Armstrong to intentionally destroy exculpatory evidence or testify falsely (Exhibit 13; Tr. 149).

Petitioner's appellate counsel was left with precisely the type of speculative, "'conclusory, unprovable, [and] unspecific claims'" that the OCCA correctly held to be meritless (Exhibit 11, pp. 4-5) (quoting *Logan*, 293 P.3d at 978-79). *See Hooks*, 689 F.3d at 1187 (speculation is not enough to demonstrate reasonable probability the outcome would be different). So lacking in substance was Petitioner's claim, the OCCA observed, that it failed to even raise an issue of material fact (Exhibit 11, p. 5). Therefore, the underlying ineffective assistance of trial counsel claim advanced by Petitioner would have been meritless, and appellate counsel was not ineffective for not including it in Petitioner's direct appeal. *Hawkins*, 185 F.3d at 1152.

As Petitioner's underlying claim of trial ineffectiveness had no merit, the OCCA did not unreasonably apply *Strickland* when evaluating Petitioner's ineffective assistance of appellate counsel claim in his application for post-conviction relief. *Cargle*, 317 F.3d at 1202. Petitioner makes no attempt in this Court to satisfy the "doubly deferential" standard of review by showing any probability, much less a reasonable one, that he would have prevailed on direct appeal had the trial counsel ineffectiveness claim been raised. *Smith*, 528 U.S. at 285; *Milton*, 744 F.3d at 669; *Byrd*, 645 F.3d at 1167-1168. In fact, other than mentioning some of the statutory words in his ground for relief, Petitioner presents no argument at all as to how the OCCA's order affirming the denial of his post-conviction application was "contrary to, or an unreasonable application of, clearly established federal law" (*see* Petition, pp. 3-3a).

*Id*. at 20-23 (footnotes omitted).

Of significant importance, the OCCA affirmed the state court's denial of post-conviction relief and provided the following explanation:

> We find no merit in [Petitioner's] claim as alleged in his Post-Conviction application warranting relief. [Petitioner's] ineffective assistance of appellate counsel claim based upon his assessment of Deputy Armstrong's motives and his claim of exculpatory police video is speculative, and not supported by any credible evidence. Other than [Petitioner's] version of events, nothing in the record supports a claim that Deputy Armstrong purposely destroyed evidence, much less that the tape in question contained exculpatory evidence of [Petitioner's] commission of the offense.
>
> After examining [Petitioner's] claims of ineffective assistance of counsel, based on appellate counsel's failure to adequately raise these claims, and pursuant to this Court's decision in the *Logan* and *Strickland* standards stated above, we find [Petitioner] has failed to establish that appellate counsel's performance was deficient or objectively unreasonable and has failed to establish any resulting prejudice. To support his ineffective assistance of appellate counsel claim, [Petitioner] must show that appellate counsel would have prevailed on direct appeal had he argued trial counsel was deficient and that these enumerated errors resulted in prejudice. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. His claims as presented in this application for Post-Conviction relief are not supported by the appeal record filed in this matter. This Court has held that "merely conclusory, unprovable, or unspecific claims of ineffective assistance of appellate counsel do not raise an issue of material fact." *Logan*, 2013 OK CR 2, at ¶ 23, 293 P.3d at 978-979. [Petitioner's] ineffective assistance of appellate counsel claim is without merit.

*Jackson v. State*, No. PC-2016-279, slip op. at 4-5 (Okla. Crim. App. June 15, 2016) (unpublished). [Doc. 13-11 at 4-5].

The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. To prevail on his claim of ineffective assistance of counsel, the defendant must prove deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficiency, the defendant must overcome the strong presumption that counsel's conduct fell within the wide range of professional conduct, including trial strategy. *Id*. at 689. To prove prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. In *Harrington v. Richter*, 562 U.S. 86 (2011), the Supreme Court further explained:

> Surmounting *Strickland's* high bar is never an easy task. An ineffective-assistance

claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

*See Richter*, 562 U.S. at 105 (internal citations and quotation marks omitted).

More recently, in *Johnson v. Carpenter*, 918 F.3d 895 (10th Cir. 2019), the Tenth Circuit Court of Appeals provided the following guidance regarding the application of *Strickland* in habeas corpus proceedings:

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this case. AEDPA "circumscribes our review of federal habeas claims that were adjudicated on the merits in state-court proceedings." *Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012). Under AEDPA, a federal court may grant relief to a state prisoner only if he has established

> that the state court's adjudication of the claim on the merits (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Littlejohn v. Trammell*, 704 F.3d 817, 824 (10th Cir. 2013) (quoting 28 U.S.C. § 2254(d)).

This standard is "highly deferential [to] state-court rulings" and demands that those rulings "be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam). "If this standard is difficult to meet, that is because it was meant to be. ... It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents. It goes no further." *Harrington v. Richter*, 562 U.S. 86, 102, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (citations omitted).

The burden on the petitioner is particularly difficult when he is pursuing an ineffective assistance of counsel claim. This is because the state court must unreasonably apply *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A *Strickland* claim will be sustained only when (1) "counsel

> made errors so serious that counsel was not functioning as 'counsel' " and (2) "the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. 2052. Thus, "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Richter*, 562 U.S. at 105, 131 S.Ct. 770 (citations omitted).
>
> Federal courts, therefore, "must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* Our only task, then, is to determine whether reasonable jurists could agree with the OCCA that [petitioner's] trial and appellate counsels acted reasonably. *See id.* AEDPA allows us to go no further.
>
> \*   \*   \*
>
> To succeed on his claim of ineffective assistance of appellate counsel under the Sixth Amendment, [Petitioner] must establish "both constitutionally deficient performance and prejudice as required by *Strickland*." *Moore v. Gibson*, 195 F.3d 1152, 1180 (10th Cir. 1999). This means that a court cannot find ineffective assistance of appellate counsel unless there is "a reasonable probability the omitted claim would have resulted in relief" on direct appeal, *Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001), because there can be neither deficient performance nor prejudice "[i]f the underlying issue was not valid," *English v. Cody*, 241 F.3d 1279, 1283 (10th Cir. 2001).

*See Johnson v. Carpenter*, 918 F.3d at 899-900. *See also Hawkins v. Hannigan*, 185 F.3d 1146, 1152 (10th Cir. 1999) ("When a habeas petitioner alleges that his appellate counsel rendered ineffective assistance by failing to raise an issue on direct appeal, we first examine the merits of the omitted issue. If the omitted issue is meritless, then counsel's failure to raise it does not amount to constitutionally ineffective assistance.").

As noted above, Petitioner claimed that Officer Galicia wanted to get him off the streets. Petitioner also contended that Officer Galicia found the drugs on the floor while Petitioner and other arrestees were in the book-in area, meaning the drugs were therefore not in his possession, and that Deputy Renken had lied about seeing the drugs drop from Petitioner's pant leg. Petitioner argues that if the package of methamphetamine had been on his body, it would have been discovered during one of the searches prior to the book-in. He is confident that the surveillance footage of the room would have proven his innocence. Each of these claims were asserted during the jury trial and were based solely on the testimony of Petitioner. He also admitted that he had

three prior felony convictions, two of which were related to crack cocaine, and that he had been using drugs since he was 10 or 11 years old, explaining that "I used drugs before [the arrest date], the whole time, every chance I get," and that "I have used methamphetamine before." [Doc. 14-2 at 179-82].

Petitioner now relies heavily upon the testimony found on page 149 of the trial transcript. Petitioner speculates that Deputy Renken told Deputy Armstrong that he "found the methamphetamine on Petitioner," and in particular, "*that the Petitioner denied that the methamphetamine belonged to him.*" [Doc. 1 at 4; Doc. 15 at 4, 7, 8] (emphasis added by this court). Petitioner then argues that Deputy Armstrong destroyed the surveillance footage, knowing that the footage could prove his innocence, and thereafter lied to cover up his misconduct. Petitioner also leaps to the conclusion that his trial counsel was ineffective for not objecting when the prosecutor deliberately deceived the jury by presenting false testimony, and that his appellate counsel was ineffective for failing to raise the claim on direct appeal. This argument falls flat.

Petitioner's testimony was clearly at odds with the testimony from the State's witnesses. Deputy Renken unequivocally testified that the drugs did, in fact, drop out of Petitioner's pant leg in the book-in room. The deputy acknowledged that such things can happen, even after an inmate has been previously searched for contraband. Moreover, Deputy Renken, when asked if he had notified anyone else that he had found drugs, simply stated that he "talked to the jail administrator in the morning and told him what happened that night." [Doc. 14-2 at 149]. Deputy Renken's statement was vague and Petitioner was not present when the conversation took place. There is no way to know whether the deputy specifically told the jail administrator that Petitioner had denied the methamphetamine belonged to him. Furthermore, Deputy Armstrong testified that he did not recall Petitioner ever contacting him regarding the alleged setup, and that he would have "[p]ulled the video and burn[ed] the disk off" if Petitioner had reported the allegations to him. *Id.* at 194. He explained that the surveillance footage is recorded over approximately every three weeks.

The jury also heard testimony from Officer Galicia about the traffic stop. Petitioner was placed under arrest because he was driving without a license. And despite Petitioner's claims to the contrary, Officer Galicia testified that he did not find the drugs on the floor in the book-in area,

that Deputy Renken had handed the drugs to the officer after they were found, and that the officer did not recall making statements that "We've got to get you off the streets." *Id*. at 196-97.

Lastly, there is no evidence that Petitioner, the State's witnesses or the prosecutor reviewed the surveillance footage. As noted above, Petitioner was arrested and transported to the jail on June 26, 2013. The jail administrator explained that the surveillance footage would have been available for approximately three weeks. Petitioner's jury trial took place the following year, on February 4, 2014. Petitioner alleges that the jail cameras would have shown he was innocent. On the other hand, the surveillance footage, if available, could have provided *additional* evidence supporting Petitioner's conviction. There is simply no way of knowing what the surveillance footage would have revealed.

Petitioner claims appellate counsel was ineffective for failing to raise a claim of ineffective assistance of trial counsel, alleging trial counsel was ineffective for not objecting when the prosecutor deliberately deceived the jury by presenting false testimony. The court is unaware of any evidence, other than Petitioner's version of events, which undermines Deputy Renken's testimony that the drugs dropped from Petitioner's pant leg, or that proves Deputy Armstrong destroyed the surveillance footage and thereafter lied on the stand to cover up the alleged misconduct. In other words, a prosecutor would have no reason to doubt the credibility of the State's witnesses, and the Petitioner has not shown that the prosecutor deliberately deceived the jury by presenting false testimony. Trial counsel would have no reason to object under the circumstances, meaning Petitioner has not shown that trial counsel's performance was deficient or that he suffered prejudice as a result. As noted by Respondent, "[w]ithout any proof that Petitioner or his alleged innocence was memorialized on the surveillance tape, or that Deputy Armstrong purposely allowed the tape containing alleged exculpatory evidence to be taped over or otherwise destroyed, a viable claim of ineffective assistance of trial counsel for not lodging an objection at trial during Deputy Armstrong's testimony would have been fruitless on direct appeal." [Doc. 13 at 22].

The court agrees with the OCCA's conclusion that Petitioner's ineffective assistance of appellate counsel claim is without merit. Because the underlying claim of ineffective assistance of trial counsel lacks merit, appellate counsel did not perform deficiently in failing to raise the

claim. The OCCA's decision was not contrary to, nor an unreasonable application of, *Strickland*. Petitioner's Ground I is denied.

**Certificate of Appealability**

The court further finds Petitioner has failed to make a "substantial showing of the denial of a constitutional right," as required by 28 U.S.C. § 2253(c)(2). In addition, he has not "demonstrate[d] that reasonable jurists would find [this] court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Therefore, a certificate of appealability shall be denied.

ACCORDINGLY, Petitioner's petition for a writ of habeas corpus [Doc. 1] is DENIED, and a certificate of appealability is DENIED.

It is so ordered this 6th day of January, 2020.

THE HONORABLE RONALD A. WHITE
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF OKLAHOMA